22-9002, Bats Global Marketing Holdings v. Center for Internal Revenue. You may proceed. Good morning, Your Honors, and may it please the Court. I'm Mario Vertolini, appearing for the Appellant, Bats Global Markets Holdings.  Bats was founded in Kansas City in 2005, where its employees wrote the software code for trading securities that ultimately became the BATS Exchange. BATS gave its customers access to this online platform, and they use it to execute millions of trades, with complexity and at speeds not possible in person. The question before this bill is whether BATS is entitled to induction under former Section 199 of the Internal Revenue Code, based on the income it derived from this online platform. Congress enacted Section 199 as an incentive for producing software and creating jobs in the United States, which is what BATS unquestionably did. The tax court nevertheless denied BATS this benefit, and I'll focus on two legal errors, and one clearly erroneous finding of BATS. These three errors all involve the application of the so-called third-party comparable exception in the Treasury regulations that were promulgated under Section 199. And the first legal error I'll address is the tax court's error in asking the wrong threshold question in applying the exception. The court asked whether the gross receipts that BATS derived from its customers were either for online services or for providing customers with access to the software for their direct use, but not for both. The text of the exception, which is set forth on page 78 of our opening brief, provides that notwithstanding, it uses the word notwithstanding, that the fees are for online services, they must also be for providing customers with access to software for their direct use in order to qualify for the exception. And if the exception applies, it treats otherwise non-qualifying fees from online services as if they are qualifying fees from selling software by downloader on the disk. As a result, the exception simply has no application if the fees cannot be for both services and for access to and use of the software. The proper inquiry under the threshold question in the exception is whether the fees are for providing customers with access to and use of the software, even though they are also for providing online services. So would, like, Ameritrade be able to have this deduction? Potentially. It would need to satisfy the second condition for the exception, which is pointing to comparable third-party software that is sold by download. Well, is it direct use? I mean, if I log into my online banking and I access their software and direct things to happen in my accounts, transfer money, whatever, that is specifically excluded from this exception, which gives us some idea that that's not viewed as being my direct use. Respectively, Your Honor, the exception, the regulation that says online banking services are not qualified cites to little i, number two in the exception, which is the general rule that services do not qualify. It does not cite little i, the exception to third-party comparable, nor does it mention the existence of third-party comparable software. If there were third-party comparable software for that banking software, there would then be the question of allocation between the value of the software being provided and the other assets provided by the bank, the credit, the loans, the holding of money, and so forth. And that allocation is something that you see in example six of the regulations, which says there's one fee for payroll services and an allocation between use of the software and the data storage provided by the provider. Let me give you a little hint. Three little i, say Romanet 3. Romanet. I've heard that. That's a useful name. But then I would have to ask him what's Romanet. I just told you. Go ahead. As to the inquiry, I suggested the court, the regulation requires that it's looking at whether the fees are for use of the software. The tax court found that the user agreement for the BATS customers gave users the right to access the exchange to trade, to execute trades. Well, as I understand it, they access the exchange, and they give parameters, they give instructions, and then the software executes the trade. It does whatever it does, looks at good matches, and operates within the parameters, the directions that were given by the customer. Am I understanding you? That's correct. The user agreement says, the court quotes it, that the users have the right to access the exchange to execute trades. And the court goes on to say that the matching of orders occurs without human intervention by the operator, by BATS. Does that matter? I mean, where in the regs does it tell you that this is determined by whether a computer program or a human being? So if I call my stockbroker and I say, execute this trade, I want this, does it matter that instead I send written directions to the software? Yes, it does matter. I think the government would agree that if the software merely facilitates the service, then the fee would not be for the software. For example, I call my travel agent who uses software to enter the trip request. Or I sign up to an airline's website and I book a ticket on an airplane. The software is facilitating my purchase of the airline ticket. Was that a service? The software is facilitating something else. The value proposition is not in the software. It's in something outside the software. And what we have here is that there's no outside the software. There's no service that BATS is providing. It doesn't have inventory of stocks it's selling. The matched orders go elsewhere. Isn't it kind of like the online auction example? The online auction example, like the banking example, in its own text cites to Romanet 2 and not to Romanet 3. It doesn't refer to any third-party comparable software. And even if you look at the structure of the examples, as you go from example 1 to example 9, they cite Romanet 2 and then Romanet 3 and then Romanet 4. They march through the example of general services, talk about self-comparable, third-party comparable, But if you're just paying for the software, something that's essentially the same as buying the disk, but you access the disk on the Internet, then why is the pricing structure the way it is? Why does it matter how many transactions, whether it goes through, and those aspects of the interaction with the software? Why isn't it just a flat rate for the software? It would be like using Westlaw, and if you use the Supreme Court site, use something. Anyway, explain why that doesn't. Well, I agree with the court. Tax court did articulate a rule not found in the text that if there are some cases where the software is used without charge and the fees for other uses of the software are non-qualifying, that they're not for these software, that is inconsistent with the TurboTax example in the regulations, where the pricing that's in the user agreement, which is in the record, of TurboTax, says that you don't pay for TurboTax online. You can use it without charge unless you print the return or file it, which means that you can use that online software to check the results under a competitor's offer, or you can copy the numbers down onto a paper return and file that without paying a fee. We also have that in the... Well, that seems different to me than the pricing structure that you were just asked about. I mean, that says, you know, we're not going to charge you unless you actually use our product for what it's intended for. Go ahead, look, you know, try it on, but unless you buy the shoe, you're not going to pay for it. Yours is different, because what yours says, it depends on what kind of search you do, it depends on how many searches you do. That doesn't sound like I purchased the software and I can play on it all day if I want or I can go in once a month, but I own that software and I'm directly operating it. Well, the uncontested evidence in the record is that we have transaction fees in a third-party license. That's as parent SIBO downloaded software onto its own system from Cinema, and the license fees included transaction fees that were payable based on the revenues from the various transactions. Well, those are different customers, right? Those are customers who operate their own security exchange. They're traders. Traders, okay. As opposed to individuals who go in, connect, and give you instructions, parameters of deals they want you to make for them. Do you see that as a difference that matters? Well, I see that the software is unique in that the additional copy of the software or additional use of the software doesn't occur on the developer's side at additional cost. So the pricing is structured to maximize use, and the pricing is structured to relate to the benefits perceived by the users of the software. As the Supreme Court observed in Brand X, often the price is set with reference to the benefit perceived by the customer, the user, regardless of the intermediate elements that are contributing to that. In effect, the benefit is driving it, and it can be flexible pricing. And we have an economist in the case who testified that the pricing that that set was economically rational to incentivize the behavior. How would I use your product and at the end of the day not incur any expense? The user of the badge platform could not have match trades. It could happily be paying for the software access on the exchange, or it's that it could use, but without actually using it. For some reason, there's no desire on that day to trade. It wouldn't have that reserve. The way in which we subscribe to software all the time we may or may not use. No further questions. I have to reserve the final one. That went fast. Yeah. Good morning. Jacob Christensen for the Commissioner of Internal Revenue. May it please the Court. This morning I'd like to discuss first the proper interpretation of the online software exception, which BATS relies upon in this case, and the dispositive factual finding by the tax court that BATS customers were paying not in order simply to use BATS software, but rather they were paying for the trade execution services that BATS provided. Second, I'll discuss BATS' failure to identify a third party comparable. In considering the regulatory exception for online software, it's important to keep in mind the statutory text under which the regulation was promulgated. The statute enacted by Congress does not cover gross receipts derived from services that do not qualify for a deduction, with limited exceptions for construction, engineering, and architecture that are not an issue here. In promulgating, therefore, online services under the statute are not covered.  Thirdly, the Treasury Department described this online software exception as being narrowly tailored, and it applies where gross receipts are derived from giving access to a customer to computer software for the customer's direct use. It does not apply where the customer is paying fees for services that are merely facilitated by computer software, as the tax court found was the case here with BATS customers. So your position would be that if I got on my computer and used their site to make a trade, that all I'm doing is basically giving instructions and what I'm paying for is their system to go ahead and execute it for me? You're paying for BATS online trading execution services. BATS had to qualify to be a registered dealer and broker with the SEC. It had to submit an application. It had to comply with the SEC's rules and enforce compliance by its members. In order to route trades to outside markets, BATS had to be a qualified dealer and broker that was registered with those outside markets. BATS had to find counterparties for the users so that they could execute trades. There would have been no trades had there been no counterparties that BATS found and entered into agreements with to access its exchange. All of those services are the services that BATS customers need. I guess you would also say a service they provide is they've got to go find the low-cost option for what you want to buy? That's right. That's part of compliance with the SEC's rules. The National Best Bidder Offer rule requires that the customer desiring to execute a trade have access to the best bidder, the best offer for that trade. In order to do that, BATS had to look at data from outside exchanges and compare the offers in its own exchange to those exchanges as well to make sure that the customer executing a trade on their exchange was getting the best price. That's another service that BATS provided as part of all of this, and that is what the customers were paying for. None of BATS customers would have paid BATS a fee merely to interact with the software online. That's not what they would do. Well, some of their customers do, right? Some of their customers actually use the software to operate their own trading market. No, you're only referring to the third parties? Yeah. The third parties did sell software to customers, and the customers of those third parties used that software to operate their own exchange. To operate an exchange as opposed to sending instructions for parameters of trades to the exchange. Correct. In other words, the customers of those third parties were like BATS. Is there a definition for direct use that is provided anywhere in the regs or in case law? There is not, Your Honor, and to that point, it's helpful to refer to the examples. My friend misreads the examples and their meaning. He argues that examples one and two that deal with the online banking services and the online auction services are merely demonstrating a rule without taking into account the third party comparable exception, but that's not the case. Those examples themselves say that online banking services, online auction services do not qualify because they are online services and therefore are not domestic gross proceeds. The heading of the examples introducing the examples states that the following examples illustrate the application of this paragraph I6 which includes the entire rule, not just the limited part that my friend would have to focus on. So examples one and two are examples of services that do not qualify because they are online services and that they don't meet the threshold requirement as we've referred to in our brief. So regardless of whether there would be a third party comparable for online auction software, they would not qualify because the customer is paying for a service in those examples. In the tax preparation software example, which is example four, the example states that the threshold requirement is satisfied when it says that O also derives gross receipts from providing customers access to the computer software for the customer's direct use while connected to the internet. So we know that in the context of the tax preparation software, the threshold requirement is already given in the example. And then the third, whether there's a third party comparable is also discussed in that example. Again, the fundamental reason that BATS does not qualify for the deduction is the tax court's finding that its customers were not paying merely to use BATS software. They were paying for a service that was facilitated by BATS software. In essence, it's just an alternative to, going back up, the exception applies in essence where a customer is given access to software online that is really just an alternative to that customer purchasing the software through a disk, or being able to download it onto its computer. That's where the narrow exception applies in those situations. And here, the customers were paying for a service. I want to move you to a different issue, which is the exclusion of the bids information on trading software. You know, the decision is pretty terse. And I think you'd have to stretch to say that it considered the woodworker factors. Isn't that an abuse of discretion to have excluded that without going through those factors? This court's precedent is clear that a district court or the tax court in this case is not required to make explicit findings with respect to those factors, but also that the court should consider those factors in reaching its decision. And while the tax court's decision is brief, the judge stated that after reviewing the respondent's motion and petitioner's response, we conclude that it is too late in the proceeding to include the evidence. The commissioner's motion focused and discussed at length the woodwork supply factors, and the petitioner's response did as well. So when the court states that the court reviewed those papers and then concluded, based on having reviewed those papers, that it was too late, the court... I think it's... How do we tell what the court did or didn't consider with respect to prejudice or ability to cure? Yeah, so we're... The court didn't explain which way each of the individual factors weighed, but again, I would say that this... Well, it didn't even say I considered all of them. The fact that the court found that it was too late really implicates all of those factors, I would argue. What if I don't agree with you? I guess I would just point the court to the precedent that this court has stated that the court need not make explicit findings... Yeah, don't have to make explicit findings, but we have to have something to review. Right, and I... We can't just speculate about... In this case, fact discovery had closed. Fact discovery closed on February 17th of 2020. Expert discovery had closed. The party's expert depositions had closed. All of that had passed, and the eve before the parties were to file a pretrial memorandum, counsel disclosed... And those are all things you argued to the district court, but we have said that the tax court must present an explanation of its choice sufficient to enable this court to determine that it did not act thoughtlessly, but instead considered the factors relevant to its decision and, in fact, exercised its discretion. I don't know how we're able to do that when the only thing it said is, it's too late. I would submit that that's sufficient under these circumstances. That, given the arguments in the parties' briefs. And I will also say, you know, the court need not even reach this issue if the court agrees with the government that the threshold requirement to begin with has not been satisfied here. The court need not even decide whether there is an adequate third party variable, which is an additional reason to affirm, you know, it's an independent and additional reason why the fees... One of the threshold requirements related to the logical port fees, and do you... Don't you... Do you think the tax court did an error in finding... Making that... Drawing that conclusion? No, so the tax court found that the fees charged for logical ports were just for that, for the logical connectivity that is required in order for the software on the customer's computer to communicate with the software on BAT's exchange or server. So what the court found was that the customer's fees were paid for those logical ports. Well, but in fact, I mean, I think the fees were paid for access to the handler software, right? Not just to the ports. Well, so Dr. Martinez, the government's expert, explained in his expert report, which is... I'm looking for this citation. The expert report is in appendix volume 35 on page 8571 of the appendix. He describes the logical port and explains that the industry standard term logical port refers only to that logical connectivity and does not refer to application software that handles the data transmitted through the port after it has been transmitted through the port. So when the term logical port is used in the industry, it means just that... Well, and that may be what logical port means, but what the court's finding was about what the logical port does. And, I mean, I think what it does is it connects them to the handler software. Well, it connects them to all, right, to the systems to where the trace could be executed through the software. Still, the customers are paying that fee for the logical port. They're paying it in order to avail themselves of the trading services that that provides. No customer would have paid a logical port fee just so that they could interact with the order handler software and get their emails out. Right. So, I mean, the ultimate decision might still be the same, but there still could be a factual finding that's incorrect. That's correct. I would agree with that. I don't think that the factual finding was incorrect based on the citation and the expert testimony by Martinez that I've cited, but I agree with that assessment. Your time has expired. Thank you. We'd have to take a quarter further. Your Honor, I just have a couple of points. The first is that all of the services mentioned that were so-called performed by VATS are actually performed by the software. The other customers put in orders, those are matched by the software. The choice of orders that are put in is by the software. If it's routed to another exchange, it's by the software. Why does that matter? It matters because the argument of the government is that our software facilitates other services, but if the only services are performed by the software, there's no other service to perform. But if you're charged for the software, then you'd think, okay, I get the software, I can use it for any services I want, but if your charge is per service provided, that makes it look like the customer is not paying for the software, but paying for the service, doesn't it? Well, there are different ways to price software depending on the way to maximize use, and the economist that testified in this case said that pricing was set to maximize use of the software. I mean, I can't use the software without you, right? So this isn't a case like where I go and buy Microsoft Office and use their software however I want. I don't have to get their permission for every spreadsheet I create, but for you, for this, when I use your software, you authorize, I mean, you put down rules on me, and I'm using your license and all kinds of stuff like that. Yeah, and well, if TurboTax follows the IRS code, games have rules that are in the game. Right, but I can use TurboTax. They're using publicly available information. They don't have to have a license to use the tax code. You have to have a license to make trades. I'd have to have a license to make trades if I didn't have you. Time's up, but the answer to that question is that if you look at the third parties, the operating chain for the third-party software, they themselves use it to trade. As the tax court found on page 33, the operators themselves trade on it. So they can buy that software and use it as an example of that E6 software. But that's not what these, I mean, they're two different types. Right. Right, okay. Thank you. Thank you, counsel. Case is submitted, and counsel are excused.